IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35807-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TALON CUTLER-FLINN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. —Talon Cutler-Flinn was sentenced to 491 months of total confinement following convictions for 11 crimes. All were crimes committed against his fiancée and eight were committed on three days. He challenges whether the State's evidence supports the premeditation required for his attempted murder conviction, contends that his conviction of multiple assaults occurring on the same day violate double jeopardy, and challenges no-contact orders entered and legal financial obligations imposed by the court.

We hold that one of the fourth degree assault convictions constitutes double jeopardy and vacate it, but otherwise affirm the convictions. We vacate a lifetime no-contact order as it relates to Mr. Cutler-Flinn's daughter and direct the trial court to

reconsider its parameters.  Finally, we order certain legal financial obligations to be struck.

## FACTS AND PROCEDURAL BACKGROUND

Talon Cutler-Flinn was living with his fiancée, S.M.,[1] when, in November 2016, he assaulted her for the first time.  It was not the last time.  He assaulted her again in December 2016.  On New Year's Day 2017, he so terrorized and brutalized her that she finally disclosed his actions to her mother and reported them to police.  In committing the November and New Year's Day assaults, Mr. Cutler-Flinn knew that S.M. was pregnant and he directed some of his blows to her stomach, telling her he wanted their babies to die.

On January 3, 2017, the State charged Mr. Cutler-Flinn with the following crimes, based on the following conduct, which it alleged took taken place on the following days:

| Count | Charge | Conduct alleged |
|---|---|---|
| *On a date between November 7 and 23, 2016:* | | |
| Count 1 | Fourth degree assault (DV) | Intentionally striking |
| Count 2 | Second degree assault (DV) | Strangulation or suffocation |
| *On a date between December 15 and 24, 2016:* | | |
| Count 3 | Fourth degree assault (DV) | Intentionally striking |
| Count 4 | Second degree assault (DV) | Strangulation or suffocation |

---

[1] Initials are used to protect the victim's identity, consistent with a general order of this court.  *See* General Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012) available at http:// www.courts.wa.gov/appellate_trial_courts/?fa =atc.genorders_orddisp & ordnumber=017 & div=III.

*On January 1, 2017:*

| Count 5 | Fourth degree assault (DV) | Intentionally striking |
| Count 6 | Second degree assault (DV) | Strangulation or suffocation |
| Count 7 | First degree kidnapping | Intentional abduction |
| Count 8 | Attempted first degree murder (DV) | Beat, strangled [S.M.], bound and gagged her, drove her to a remote location |

Clerk's Papers (CP) at 1-8.

Within weeks after being charged, Mr. Cutler-Flinn mailed two letters to S.M.'s home, addressed to her two-year old daughter, professing his love for "you girls," suggesting that his actions were the result of mental illness, and that he had been told that with treatment he had a 96 or 97 percent chance of being cured of his mental disorders and "living a normal life." CP at 26. Based on a court order that Mr. Cutler-Flinn have no contact with S.M., the State amended the information to add two counts of violation of the order. When a third letter from Mr. Cutler-Flinn was found by S.M. outside her home—again apologizing, claiming mental illness, and telling her how much he loved and needed her—the State amended the information a second time, to charge a further violation of the protection order.

Mr. Cutler-Flinn waived trial by jury and proceeded to a bench trial in late 2017. At the outset of trial, Mr. Cutler-Flinn's lawyer announced that his client conceded committing the protection order violations and that he was guilty of the first degree kidnapping charge.

The State's witnesses at trial included S.M., her mother, two of her coworkers, and several law enforcement officers. Because Mr. Cutler-Flinn's claim to be mentally ill was in evidence as a result of his protection order violations, the State called a psychologist who had been court-ordered to evaluate Mr. Cutler-Flinn's competency to stand trial. The psychologist testified that in evaluating Mr. Cutler-Flinn, he had found no psychotic disorder or mental disease.

At the conclusion of trial, defense counsel's principal argument was that Mr. Cutler-Flinn had been overcharged for his conduct on New Year's Day. He argued that all of Mr. Cutler-Flinn's actions on that day fell within the ambit of first degree kidnapping by means of "intentionally abduct[ing] another" with "[the] intent [t]o inflict extreme mental distress on . . . her," as prohibited by RCW 9A.40.020(1)(d). The trial court rejected the argument and found Mr. Cutler-Flinn guilty on all counts.

At the time set for sentencing, the trial court entered written findings presented by the State, which included findings that Mr. Cutler-Flinn's acts of strangling S.M. were "separate and distinct" assaults from the blows he delivered on the same day. CP at 157-58. This was over the objection of Mr. Cutler-Flinn, whose lawyer argued that the assaults committed on a single date involved the same victim, same time, and same place.

The trial court sentenced Mr. Cutler-Flinn to 491 months of total confinement. Its judgment ordered that Mr. Cutler-Flinn not have contact "for life" with "the victim & her family." CP at 163. Among the persons protected by a domestic violence protection

4

order filed with the judgment and sentence was S.M.'s baby daughter C.A.M., born four months before the sentencing, who was Mr. Cutler-Flinn's biological child. Mr. Cutler-Flinn appeals.

ANALYSIS

Mr. Cutler Flinn raises four issues on appeal. He challenges (1) whether separate acts occurring during what he characterizes as "the same physical altercation" constitute separate crimes, (2) the protection orders entered by the sentencing court, (3) whether the trial court conducted an adequate *Blazina*[2] inquiry, and (4) the sufficiency of the evidence to support a premeditated attempt to kill S.M. We address the issues in the order raised.

I.     ONE OF THE FOURTH DEGREE ASSAULT CHARGES VIOLATES CONSTITUTIONAL
        PROTECTIONS AGAINST DOUBLE JEOPARDY

On each of the three days that Mr. Cutler-Flinn was charged with assaulting S.M., he both struck her and strangled her. The State charged his acts of striking her on the three days as three counts of fourth degree assault. It charged his acts of strangling her on the three days as three counts of second degree assault.

Mr. Cutler-Flinn contends that the three fourth degree assault convictions violate constitutional protections against double jeopardy because his assaultive conduct was punished by the second degree assault convictions. He argues that striking and strangling S.M. were, in each case, one course of conduct.

---

[2] *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015).

The double jeopardy clause of the Fifth Amendment to the United States Constitution and the state constitutional protection against double jeopardy protect against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense. *State v. Reeder*, 184 Wn.2d 805, 825, 365 P.3d 1243 (2015). At issue here is the third protection, against multiple punishments for the same offense. Claims of double jeopardy present an issue of law that we review de novo. *State v. Hughes*, 166 Wn.2d 675, 681, 212 P.3d 558 (2009).

The analysis of whether multiple punishments violate double jeopardy differs depending on whether the convictions are imposed under a single statute or under different statutes. In the latter case, the court usually applies the "*Blockburger*"[3] analysis, determining whether the convictions were "the same in law and in fact." In *State v. Villanueva-Gonzalez*, however, our Supreme Court recognized that while convictions for different degrees of assault are technically imposed under different statutes, the overlap between the elements of fourth degree assault and those of second degree assault makes the *Blockburger* analysis unhelpful. 180 Wn.2d 975, 981-82 & n.3, 329 P.3d 78 (2014). It therefore applied a "unit of prosecution" analysis of assault. *Id.* at 982. A unit of

---

[3] *E.g.*, *State v. Calle*, 125 Wn.2d 769, 777, 888 P.2d 155 (1995) (citing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182, 76 L. Ed. 306 (1932)).

prosecution analysis "asks 'what act or course of conduct has the Legislature defined as the punishable act.'" *Id*. at 980-81 (quoting *State v. Adel*, 136 Wn.2d 629, 634, 965 P.2d 1072 (1998)).

*Villanueva-Gonzalez* identified the unit of prosecution for assault and is controlling. Because Washington statutes do not define assault and the common law definition does not make clear whether assault is a course of conduct or a separate act offense, the Supreme Court looked to case law in other jurisdictions and ultimately applied the rule of lenity. It held that "assault should be treated as a course of conduct crime until and unless the legislature indicates otherwise." *Id.* at 984. It recognized at the same time that "[t]here is no bright-line rule for when multiple assaultive acts constitute one course of conduct." *Id.* at 985.

While holding that any analysis of when multiple assaultive acts constitute one course of conduct "is highly dependent on the facts," the Court identified the following as "useful" factors that "courts in other jurisdictions generally take . . . into account":

> — The length of time over which the assaultive acts took place,
> — Whether the assaultive acts took place in the same location,
> — The defendant's intent or motivation for the different assaultive acts,
> — Whether the acts were uninterrupted or whether there were any intervening acts or events, and
> — Whether there was an opportunity for the defendant to reconsider his or her actions.

*Id.* It added that "no one factor is dispositive, and the ultimate determination should depend on the totality of the circumstances, not a mechanical balancing of the various factors." *Id.*

In framing the charges against Mr. Cutler-Flinn, the State separately charged acts of strangling S.M. and acts of striking her, and it has defended that distinction in the trial court and on appeal by citing this court's decision in *State v. Gatlin*, 158 Wn. App. 126, 135, 241 P.3d 443 (2010). In *Gatlin*, this court held that two convictions for second degree assault did not constitute double jeopardy because one was for blows to the victim and the other was for acting as an accomplice to strangulation. But in the more recent and controlling decision in *Villanueva-Gonzalez*, the Supreme Court did not attach significance to the different manners in which harm was inflicted. The jury had found Mr. Villanueva-Gonzalez guilty of second degree assault for head-butting his girlfriend, and fourth degree assault for grabbing her neck, making it hard for her to breathe. 180 Wn.2d at 978-79. The Supreme Court found that his actions constituted one course of conduct because they took place in the same location, over a short time period with no interruptions or intervening events, and with no evidence suggesting a different motivation, intent, or opportunity to reconsider his actions. *Id.* at 985-86.

To evaluate the separateness or continuing character of Mr. Cutler-Flinn's actions under the factors identified in *Villanueva-Gonzalez*, we provide additional details from the State's evidence at trial.

8

*November 2016 Incident*

S.M. testified that the first assault occurred when she and Mr. Cutler-Flinn were arguing in the kitchen and he got "really mad." Report of Proceedings (RP) at 41. He grabbed her, pulled her into the living room and pinned her to the ground. Knowing that S.M. was pregnant with his child, he hit her in the stomach, telling her he wanted her and "the baby to die." RP at 41-42. Asked by the prosecutor whether Mr. Cutler-Flinn strangled her during the November incident, she answered that he "choked me" on the throat and "cut off my breathing for a little while." RP at 43. The assault ended after he slapped her hard on the side of her face, causing her eye to quickly swell and bruise, after which he stopped.

S.M. had a miscarriage a few weeks after the assault. She suspected it was caused by the assault, testifying, "if not the attack itself, but the stress caused it." RP at 45.

While the difference between strangling and striking does not support treating Mr. Cutler-Flinn's actions as separate assaults, the fact that his blows were intended to cause S.M. to miscarry demonstrates a different intent or motivation for those assaultive acts. While it might not have been the State's reason for charging the blows and the strangulation separately, it is a sufficient basis for finding separate crimes.

*December 2016 Incident*

S.M. testified that the December incident was triggered by Mr. Cutler-Flinn's belief that she had flirted with another man at a bar. As they drove home, Mr. Cutler-

Flinn called her a "slut." RP at 47. As they pulled up to their garage, S.M. said something about her alleged flirtation that made Mr. Cutler-Flinn angry. He slammed on the brakes, put the car in park, and climbed over and got on top of her, hitting her face and ribs with closed fists. He also put his hands around S.M.'s throat and choked her, telling her she was going to die.

The State's count 3 charged the blows as fourth degree assault and count 4 charged strangulation as second degree assault. Since the acts took place in the same location, at the same time, to the same victim, and with the same intent, they qualify as a single course of conduct under the factors identified in *Villanueva-Gonzalez.*

For the first time on appeal, and having to respond to *Villanueva-Gonzalez*, the State points out S.M. testified that after pulling into the garage, Mr. Cutler-Flinn resumed hitting her. It now characterizes pulling into the garage as an interruption and an opportunity for Mr. Cutler-Flinn to reconsider his actions. But that was not a basis on which the trial court distinguished counts 3 and 4, and moving the car from immediately outside the garage door to immediately inside the garage door is too tiny a spatial and temporal interruption to justify multiple convictions. In the case of the convictions for the December assault, double jeopardy is shown. The remedy is to vacate the lesser conviction for count 3. *In re Pers. Restraint of Strandy*, 171 Wn.2d 817, 820, 256 P.3d 1159 (2011).

10

While a gross misdemeanor, the conviction for count 3 was counted toward the offender score for the felony convictions as a "repetitive domestic violence offense." *See* RCW 9.94A.030(42). Subtracting it from Mr. Cutler-Flinn's offender score would still leave him with an offender score of 11 for the attempted murder and kidnapping convictions that dictate his period of total confinement, however, so resentencing will not be required.

*January 1, 2017 Incident*

The events of New Year's Day were triggered after S.M. forgot to set an alarm, causing Mr. Cutler-Flinn to be late on the first day he had taken on a paper route. Although S.M. had agreed to set the alarm and testified she felt bad about forgetting, she responded to Mr. Cutler-Flinn's upset by telling him he should have been responsible and set his own alarm. She testified, "[T]hat made him really angry." RP at 53.

The assaultive conduct, which continued for hours, began with Mr. Cutler-Flinn grabbing S.M. by the legs, pulling her from the bed, and hitting and choking her. She had told Mr. Cutler-Flinn the day before that she was once again pregnant, and as he beat her he told her again, as he had in November, that "he wanted the baby to die." RP at 54.

At one point, S.M. broke free from Mr. Cutler-Flinn and tried to get up, but as she described it, "he put his arm around my neck and drug me to the other side of the bedroom and then he asked how long I could go without breathing and he started counting." RP at 55. He counted slowly, up to about 13. She said it was the longest he

11

had ever strangled her, she almost blacked out, and she urinated in her shorts. He told her, "[T]hat's what real fear is." RP at 56.

Mr. Cutler-Flinn then tied her hands behind her back, tied her feet together, and put a gag in her mouth. Telling her she was "gonna die for real," Mr. Cutler-Flinn took her out of the house and put on the floor behind the driver's seat of her mother's car. RP at 59.

As Mr. Cutler-Flinn drove her to an unknown location, S.M. managed to spit out the gag and begged him to stop and let her go. When he realized she was squirming in an effort to get free, he moved the driver's seat back to restrict her movement. She managed at one point to grab the side of the car seat and reach her tied hands around Mr. Cutler-Flinn's neck, but he responded by stopping the car, getting into the back seat, and again hitting and strangling her. This time, he strangled her long enough that she passed out, again losing control of her bladder.

When she regained consciousness, she was on the seat and did not immediately remember what had happened or where she was. Mr. Cutler-Flinn told her she had turned blue "and if I wouldn't have let go you would've turned purple and died." RP at 69. He retied her hands and kept driving, eventually stopping and carrying her over his shoulder to a snowy field, where he threw her into the snow by an abandoned shed. He walked away, but soon returned and took the engagement ring off her finger. After he

12

left again and S.M. could not get her hands or feet loose, she started yelling for help. Mr. Cutler-Flinn came back and carried her back to the car.

Although S.M. testified that Mr. Cutler-Flinn then told her that they had "just got started," she was never going to see her daughter again, and she "was gonna meet God soon," he did not assault her again. RP at 69, 137. As they drove home, S.M. told him that she had never called the police before and would not call them now, and while their relationship was crazy, it was fine and they were going to get through it.

For the remainder of the day, S.M. stayed at home, trying to figure out how she was going to escape. S.M.'s daughter was staying with S.M.'s mother, and S.M. eventually persuaded Mr. Cutler-Flinn that she needed to go to her mother's briefly to kiss her daughter goodnight. Upon arriving at her mother's house, she told her mother briefly about what had happened and the two of them then contacted and met with police.

Given the long duration and changing locations, there are several bases on which Mr. Cutler-Flinn's conduct on New Year's Day could be charged as more than one count of assault. As with the November incident, the State's strangulation/striking distinction caused it to separately charge blows intended to cause S.M. to miscarry from the strangulation intended to cause her other pain and injury. It is a sufficient basis for finding separate crimes.[4]

---

[4] Mr. Cutler-Flinn's opening brief included a separate assignment of error to the multiple convictions for assault based on the doctrine of merger. The argument portion

13

II.     RECONSIDERATION IS REQUIRED AS TO ONLY ONE ASPECT OF THE RESTRICTIONS ON
        MR. CUTLER-FLINN'S CONTACT WITH S.M., HER CHILDREN, AND HER MOTHER

Mr. Cutler-Flinn's judgment and sentence included the following restriction on

further contact with S.M.'s family:

from the defendant for a qualifying offense. RCW 48.48.784.

4.3     The Defendant shall not have contact with the victim & her family (name, DOB) _____
        including, but not limited to, personal, verbal, telephonic, written or contact through a third party for
        Life * years (not to exceed the maximum statutory sentence).
        ☒     Domestic Violence Protection Order is filed with this Judgment and Sentence.

CP at 163.  Two no-contact orders were filed with the judgment and sentence: a lifetime

domestic violence no-contact order prohibiting contact with S.M. and her two daughters

and a lifetime harassment no-contact order prohibiting Mr. Cutler-Flinn from contact

with S.M.'s mother.  Mr. Cutler-Flinn challenges (1) the order protecting S.M.'s mother

as not crime-related, (2) the no-contact language in the judgment and sentence as

unconstitutionally vague, and (3) the restriction on contact with his daughter as

unsupported by a necessary finding that it is reasonably necessary for his daughter's

safety.

*Restriction on contact with S.M.'s mother.*

We begin with the challenge that the lifetime restriction on contact with S.M.'s

mother is not crime related.

---

of his brief offers no distinguishable argument based on merger, however.

The Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, authorizes trial courts to impose and enforce crime-related prohibitions and affirmative conditions "as provided in this chapter." RCW 9.94A.505(9). "Crime-related prohibitions" are orders "prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). We review a trial court's imposition of a crime-related prohibition for abuse of discretion. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).

In *Armendariz*, our Supreme Court held that RCW 9.94A.505(9)[5] constitutes an independent grant of authority that need not be based on a more specific provision of the SRA. *Id.* at 112-13. The court also held that orders imposing crime-related prohibitions "reasonably include no-contact orders regarding witnesses." *Id.* at 113. Finally, the Court held that a crime-related prohibition may be effective for the statutory maximum term of the defendant's crime. *Id.* at 119-20.

S.M.'s mother testified at trial, providing evidence that confirmed several aspects of S.M.'s testimony. The mother also testified to reasons why she suspected Mr. Cutler-Flinn of domestic violence against S.M. even before S.M. admitted what was going on. Life imprisonment is the statutory maximum for kidnapping in the first degree and attempted murder in the first degree. RCW 9A.40.020(2), 9A.28.020(3)(a) (classifying

---

[5] At the time of the decision, the provision appeared at former RCW 9.94A.505(8) (2006).

15

crimes as class A felonies); RCW 9A.20.021(1)(a) (maximum penalty for class A felonies). Mr. Cutler-Flinn does not demonstrate an abuse of discretion by the trial court in ordering that he have no contact with S.M.'s mother for life.

*Vagueness challenge to "the victim & her family"*

Mr. Cutler-Flinn next contends that the reference in paragraph 4.3 of the judgment and sentence to "not hav[ing] contact with the victim & her family" is unconstitutionally vague. CP at 163.

The due process vagueness doctrine under the Fourteenth Amendment to the United States Constitution and article I, section 3 of the Washington Constitution requires that citizens have fair warning of proscribed conduct. *State v. Bahl*, 164 Wn.2d 739, 752, 193 P.3d 678 (2008). The same vagueness doctrine that applies to statutes applies to protection or no-contact orders whose violation could result in criminal penalties. *E.g.*, *City of Seattle v. May*, 171 Wn.2d 847, 855-56, 256 P.3d 1161 (2011). Such an order is unconstitutionally vague if it is either insufficiently definite such that ordinary people cannot understand what conduct is proscribed, or if it does not provide ascertainable standards of guilt to protect against arbitrary enforcement. *Bahl*, 164 Wn.2d at 752-53.

The judgment and sentence form completed for Mr. Cutler-Flinn is designed to identify protected persons by name and date of birth. *See* CP at 163. It is not clear whether "family" as used in the court's identification of "the victim & her family" is intended to have a broad meaning or a narrow one. CP at 163. But immediately

following the imprecise identification of the protected persons, the judgment and

sentence form is marked by the trial court to indicate that a separate domestic violence

protection order was filed.  The domestic violence no-contact order filed with the

judgment and sentence identifies the protected persons as S.M., by name, and her two

daughters by initials and dates of birth.

"In deciding whether a term is unconstitutionally vague, the terms are not

considered in a 'vacuum,' rather, they are considered in the context in which they are

used."  *Bahl*, 164 Wn.2d at 754.  Where multiple orders were entered and the domestic

violence protection order was explicitly referenced, the protection provision of the

judgment and sentence is not unconstitutionally vague.

*Lifetime no-contact with C.A.M.*

Mr. Cutler-Flinn argues that the lifetime prohibition on contact with his daughter

is unconstitutional and not crime related.  Given Mr. Cutler-Flinn's stated intent to cause

S.M. to miscarry when he struck her on New Year's Day—when she was pregnant with

C.A.M.—the prohibition is crime-related.

Because Mr. Cutler-Flinn has a fundamental constitutional right to parent,

however, the sentencing court's authority to impose conditions that interfere with that

right is subject to limits.  "'Conditions that interfere with fundamental rights' must be

'sensitively imposed' so that they are 'reasonably necessary to accomplish the essential

needs of the State and public order.'"  *In re Pers. Restraint of Rainey*, 168 Wn.2d 367,

17

377, 229 P.3d 686 (2010) (quoting *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008)). Moreover, the sentencing court's obligation to sensitively impose a restriction on a fundamental right "is not satisfied merely because, at some point and for some duration, the restriction is reasonably necessary to serve the State's interests. The restriction's length must also be reasonably necessary." *Id.* at 381.

When given the opportunity to allocute, Mr. Cutler-Flinn stated that while he did not want to be a part of S.M.'s life, he did want to be a part of his daughter's life, stating, "I can be something. I can be there for my daughter." RP at 333. The requirements of *Rainey* and related cases were not brought to the court's attention and there is no indication in the record that the court recognized the limits on its authority and the need to apply the "reasonably necessary" standard. As the Supreme Court did in *Rainey*, we strike the no-contact order as to C.A.M. and remand with directions to reconsider the parameters of the no-contact order under the "reasonably necessary" standard.

III.     IN LIGHT OF INTERVENING LEGISLATION AND CASE LAW, DISCRETIONARY COSTS AND THE CRIMINAL FILING FEE IMPOSED BY THE JUDGMENT AND SENTENCE SHALL BE STRUCK

Mr. Cutler-Flinn next assigns error to the trial court's failure to conduct an adequate inquiry into his ability to pay discretionary legal financial obligations (LFOs). Under RAP 2.5(a), a defendant must object to a trial court's finding that she or he has the present and future ability to pay in order to preserve a claim of error. *Blazina*, 182 Wn.2d at 830 ("[A] defendant has the obligation to properly preserve a claim of error.").

18

Following the filing of the opening brief, Mr. Cutler-Flinn moved the court to strike the criminal filing fee imposed at sentencing. He cited amendments to several Washington statutes dealing with LFOs and *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018).

In its later-filed brief, the State concedes that the law has changed since the time of Mr. Cutler-Flinn's sentencing and "an order which reflects the current law regarding financial obligations should be entered." Br. of Resp't at 24.

Statutory amendments dealing with LFOs that were made by Engrossed Second Substitute House Bill 1783, 65th Leg., Reg. Sess. (Wash. 2018), effective June 7, 2018, apply prospectively to criminal cases on direct appeal. *Ramirez*, 191 Wn.2d at 749. Among those changes were an amendment to former RCW 10.01.160(3) (2015) to prohibit the imposition of discretionary costs on defendants who are indigent as defined in RCW 10.101.010(3)(a) through (c), and an amendment to former RCW 36.18.020(2)(h) (2015) that prohibits the imposition of the $200 criminal filing fee on such defendants.

Mr. Cutler-Flinn was found to be indigent for appeal purposes, and his declaration in support of his request for an order of indigency discloses that he has no income, a basis for indigency under RCW 10.101.010(3)(c). On remand, the discretionary costs and the criminal filing fee imposed by the judgment and sentence shall be struck.

IV.    THE EVIDENCE OF PREMEDITATION OFFERED IN SUPPORT OF THE ATTEMPTED FIRST
DEGREE MURDER CONVICTION WAS SUFFICIENT

Finally, Mr. Cutler-Flinn contends that in light of the fact that he repeatedly stopped short of killing S.M., the evidence was sufficient to prove that he terrorized her, but it was insufficient to prove a premeditated intent to kill her.

"A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Substantial evidence means evidence in the record of a sufficient quantity to persuade a fair-minded, rational person of the truth of the finding. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

In announcing its verdict, the trial court observed that defense counsel had focused on whether it was proved that Mr. Cutler-Flinn abducted S.M. with the intent to kill her. As trier of fact, the court answered the question:

> Of course you did. How do we know that? Because you said so, Mr. Flinn. This time, is what you told her. This time you're gonna die for real. That's a pretty clear statement of intent. The other times were just varying degrees of assaultive behavior, but not this time. This one was different. This was final. This time you strangled her until you choked her out and she was blue and she soiled herself. And I believe at that moment that you thought you had killed her. . . .
>
> It really was, in a true sense of the word, a game of cat and mouse in my opinion. . . . Cat pounces on its prey and terrorizes it for awhile before it kills it. In this sense, it was a true game of cat and mouse. Sometimes the mouse escapes, sometimes the cat gets tired of the game and gets up and moves on. But, his intent at the start of the game was nonetheless to kill the mouse, as was yours at the start of this abduction.

20

No. 35807-1-III
*State v. Cutler-Flinn*

RP at 287. This explanation of the court's verdict identifies evidence that was sufficient.

We vacate the conviction for count 3, otherwise affirm the convictions, strike the no-contact order as to C.A.M., and remand with directions (1) to strike the discretionary costs and criminal filing fee imposed by the judgment and sentence, and (2) reconsider the parameters of any no-contact order protecting C.A.M. under the "reasonably necessary" standard.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.

21